IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CHAMBERS
U.S.D.C. Atlanta

SEP 3 0 2008

By: JAMES N. HATTEN, Clerk
Deputy Clerk

JOYCE REUSS and CHARLES M.
REUSS,

        Plaintiffs

v.

HENRY COUNTY, GEORGIA, JIM
JOYNER, Individually and in his
official capacity as Chairman
of the Henry County Board of
Commissioners, BUTCH OLIVER,
Individually and as Director of
the Henry County Building
Department, JOYNER BROTHERS
DEVELOPMENT, INC., and CHAMLEE
HOME BUILDERS, INC.,

        Defendants.

CIVIL ACTION NO.

1:02-CV-2000-JEC

## ORDER & OPINION

This case is presently before the Court on Defendant Joyner

Brothers' Motion for Summary Judgment [176], Defendant Henry County's

Motion for Summary Judgment [179], Defendant Jim Joyner's Motion for

Summary Judgment [183], and Plaintiffs' Motion for Extension of Time

to Respond to Defendants' Motions for Summary Judgment [194]. The

Court has reviewed the record and the arguments of the parties and,

for the reasons set out below, concludes that Defendant Joyner

Brothers' Motion for Summary Judgment [176] and Defendant Jim

Joyner's Motion for Summary Judgment [183] should be **DENIED WITHOUT**

**PREJUDICE;** Defendant Henry County's Motion for Summary Judgment [179], should be **GRANTED;** and Plaintiffs' Motion for an Extension of Time to Respond [194] should be **GRANTED**.

**BACKGROUND**

## I.   PROCEDURAL HISTORY

Plaintiffs originally brought this action on July 18, 2000 against Henry County, Georgia, Jim Joyner in both his individual and official capacity in Henry County, Butch Oliver, Joyner Brothers, and Chamlee Home Builders ("Chamlee"). (Compl. [1].) The original complaint included claims for equal protection violations, RICO violations, fraud, breach of contract, negligent construction, and punitive damages. (Compl. [1] at 7-16.) The case arose out of allegedly shoddy construction of the plaintiffs' home by defendant Chamlee, who allegedly obtained a building permit without obtaining necessary inspections from Henry County building officials.

Thereafter, defendant Chamlee moved to stay the action because his contract with the plaintiffs called for arbitration of any dispute [3, 14]. The Court granted this stay to permit plaintiffs and Chamlee to arbitrate their dispute, and it administratively closed the action as to Chamlee (Order of October 10, 2002 [19]). Subsequently, the Court administratively terminated the action as to all defendants, pending the conclusion of the arbitration proceedings between defendant Chamlee and plaintiffs (Order of January 2, 2003

AO 72A
(Rev.8/82)

[29]).

Before the arbitration, plaintiffs entered into an agreement with Butch Oliver, the Director of Henry County's Building Department, in which the latter agreed to aid plaintiffs in their claims against the other defendants, in exchange for a release of liability. (J. Reuss Dep. [191] at Ex. 22.) Therefore, the claims against him were ultimately dismissed. (Orders [37, 65].) The arbitration ended in 2005, with the arbitrator finding Chamlee liable to plaintiffs for negligent construction. (See Motion to Reopen Case [36], Ex. A.) This Court confirmed the Arbitration Award and entered Judgment for plaintiff. (Order and Judgment of February 8, 2006 [63, 64].)[1]

Plaintiffs filed a Motion to Reopen the Matter and to Amend their Complaint in July of 2005. [36, 40] The defendants filed various motions in opposition to the motion to amend, but the Court ultimately granted plaintiffs' motion to amend and reopened the action. (Order dated February 8, 2006 [62].)

Plaintiffs assert a number of claims in their amended complaint. First, plaintiffs assert claims of fraud and negligent misrepresentation against Joyner Brothers. (Am. Compl. [187] at ¶¶

---

[1] Unfortunately for plaintiffs, it appears that they were unable to collect any money from Chamlee. See Plaintiffs' Motion for Contempt [71].

3

53-70.) Second, plaintiffs bring claims for fraud, negligent misrepresentation, and an equal protection violation against Joyner in his individual capacity, and in his capacity as Chairman of the Henry County Board of Commissioners, and plaintiffs bring those same claims against Henry County. (Am. Compl. [187] at ¶¶ 22-28, 53-70.)

Plaintiffs base the negligent misrepresentation claims on their allegations that Jim Joyner, Joyner Brothers, and Henry County misrepresented the type of soil present on the lot, thus causing the wrong septic system to be installed. (Am. Compl. [187] at ¶¶ 64-70.) Plaintiffs argue that they relied on this representation and were damaged as a result. (*Id.*) Plaintiffs base the fraud claim on their allegations that Joyner, Joyner Brothers, and Henry County intentionally (1) falsified the records to reflect that inspections had been completed, when in fact, they had not, and (2) issued, or caused to be issued, a certificate of occupancy, even though they knew that the inspections had not been completed on the lot. (Am. Compl. [187] at ¶¶ 53-63.) Plaintiffs argue that they relied on the representations that the new home would be properly inspected and constructed according to those standards, and were damaged as a result. (J. Reuss Dep. [191] at 159.)

Lastly, plaintiffs claim that Henry County and Jim Joyner violated their rights to equal protection. (Am. Compl. [187] at ¶¶ 22-28.) According to plaintiffs, these defendants' "failure to

4

properly issue the required permits and failure to perform or enforce the required inspections created a disparity of treatment among new home buyers of Henry County...."  (Am. Compl. [187] at ¶¶ 27.)

All defendants have filed motions for summary judgment [176, 179, 183], which are now pending and addressed in this Order.

II.  **FACTS**

This case arises out of Joyce and Mike Reuss's (collectively "plaintiffs'") purchase of a new home located at 3006 Beverly Court, McDonough, Georgia ("Lot 67" or "Beverly property").  (J. Reuss Dep. [191] at 35-36; Ex. 1; Am. Compl. [187] at ¶¶ 10-15.)  Defendant Joyner Brothers Development, Inc. ("Joyner Brothers") developed Joyner Estates and sold a number of plots, including the one at issue here, to Chamlee Home Builders, Inc. ("Chamlee").  (*Id.* at ¶ 12.) Chamlee built a house on the lot, which is located in Henry County, and sold it to plaintiffs.  (*Id.*)  Defendant Jim Joyner ("Joyner") is a principal of Joyner Brothers, and he served as Chairman of the Henry County Board of Commissioners during the time period relevant to this cause of action.  (Pls.' Am. Compl. [187] at ¶ 11.)

Plaintiffs signed the contract to purchase the house on July 19, 2000 and they closed on September 8, 2000.  (Am. Compl. [187] at ¶¶ 13-14.)  It was not long before they noticed a great many defects in their home.  One of the major problems that plaintiffs noted after they moved in was the septic system's failure to drain properly,

5

which created the permanent existence of water in the crawlspace of the home. (J. Reuss Dep. [191] at 44-50.) In addition, the bathtub did not work properly and would sink about half an inch and pull away from the grout when plaintiffs filled it with water. (J. Reuss Dep. [191] at 25.) Plaintiffs allege that, in all, the home had over forty code violations that needed to be fixed. (J. Reuss Dep. [191] at 160.)

Much of this litigation has focused on the inspections that were supposed to occur on plaintiffs' home and that plaintiffs contend did not occur, as well as the allegedly inaccurate soil report. As this is an Interim Order, the Court will not set out in detail those allegations here, but they are addressed within the text of the discussion, *infra*.

## DISCUSSION

### I. THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the "pleadings, discovery and disclosure materials and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."" FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50.

6

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of*

*Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986).

## II. JIM JOYNER'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECTION 1983 CLAIM

In addition to state law claims, plaintiffs have filed a federal claim under 28 U.S.C. § 1983, alleging that defendant Jim Joyner misused his authority as Chairman of the Henry County Commission and acted in a manner that violated plaintiffs' Equal Protection right. In essence, plaintiffs contend that Joyner caused county officials to issue a certificate of occupancy as to their home, even though many of the required inspections had not been performed. Had these inspections actually and honestly been performed, plaintiffs argue, many of the defects that they have since discovered in their home would either have been remedied or the County would not have issued the certificate of occupancy that duped the plaintiffs, or any potential home buyer, into purchasing the home. Plaintiffs also contend that Joyner caused a permit to be issued allowing a standard septic system to be installed on the property, when, in fact, the soil did not support such a system. Plaintiffs have suffered extensive damages as a result of the installation of the improper

8

septic system.

## A.    **Facts**

Although defendant Joyner denies plaintiffs' allegations about his conduct, the Court must construe the facts in the light most favorable to the plaintiffs.    Taken in that light, the Court concludes that plaintiffs have established facts sufficient to show that Joyner used his power as Chairman of the County Commission to cause a certificate of occupancy to be issued when, in fact, the necessary inspections that were a predicate to issuance of such a certificate had not been performed.    Joyner was the developer of Joyner Estates, within which the plaintiffs' property and house were located.    Joyner had sold plaintiffs' plat, Lot 67, to the builder, Claude Chamlee, who ultimately constructed the house.    Joyner and Chamlee had also been business partners on another development project.    (Dep. of Chamlee [208] at 11, 18.)

Plaintiffs have submitted the Affidavit of Butch Oliver, who was the Director of the Henry County Building Department at the time that plaintiffs' house was being constructed.    In this affidavit, Oliver testifies that he had previously affixed a note to the file indicating that construction on the plaintiffs' house (Lot 67) had begun without a building permit "per Jim Joyner."    (Aff. of Butch Oliver [212] at 2, ¶ 6.)    Mr. Oliver indicated that "at no time did I authorize the construction of that house without the issuance of a

9

building permit...." (*Id.* at ¶ 7.)

Exhibit A to Oliver's affidavit is a building permit for the property. On the permit are blanks to show the dates that various inspections have been performed. All of these inspections—footing, slab, framing, insulation, trash pit, and even the final inspection-—are shown as occurring the same day—July 21, 2000—even though deposition testimony consistently indicates that some of these inspections should have been performed at earlier times during the construction process, as the work permitted an inspection to be made. (Dep. Of Santos Bowles [206] at 10). For example, it would be difficult to perform a footing inspection late in the building cycle because once the slab or foundation had been poured, it would be difficult for county inspectors to be able to inspect for that purpose. (*Id.* at 54-61.)

Most significantly, as to the above six inspections, the property is not listed as having passed. Instead, next to each inspection are the words, "BO per J.J." Butch Oliver affied that he made that notation indicating that these inspections were completed pursuant to the instructions of Jim Joyner, but, in fact, Oliver had never performed the inspections, and does not know that anyone had actually done so. (*Id.* at ¶¶ 19-20.) Because this was an irregular practice, Oliver also wrote a separate note that was affixed to the file, which note, dated on July 21, 2000 and signed "Butch Oliver,"

10

states:

> Permit was issued same day of rough insp. House was started
> without permit per Jim Joyner. Insp. Was not called in.
> House was finaled per Jim Joyner."

(Aff. of Oliver [212] Ex. B.)

While the facts would have been clearer had plaintiffs or defendants deposed Oliver to flesh out exactly what led up to the events described in the affidavit, neither did so. Thus, the affidavit is a bit cryptic. Yet, taking the facts in the light most favorable to plaintiff, one can reasonably infer that the home had not undergone all the required inspections, including a final inspection, and that this irregular practice occurred because it was so directed by County Commissioner Jim Joyner.

A computer print-out, which was generated on April 2, 2001, well after the inspection period, shows the dates of inspections on the house and was attached as Exhibit 2 to Santo Bowles deposition [206]. This print-out indicates that, of the above inspections, the framing inspection had been performed on January 5, 2000, and the house had passed. There is no indication, however, that the house had passed a footing, slab, insulation, or trash pit inspection.

Several inspections, all purportedly occurring on July 21, 2000, are listed as passing "per Jim Joyner," in the space where the words pass or fail would normally appear. Those inspections are four separate final inspections, the power inspection, the final heat

11

inspection, and the final air inspection.   As to the first final

inspection listed, that inspection had been listed as "failed" on the

two previous tries, but on the last "try," on this same July 21, 2000

date, the form indicates that the inspection passed "per Jim Joyner."

Defendant Joyner notes that Oliver's Affidavit ([212] at ¶ 18)

also indicates that Santos Bowles and Scott Burch informed Oliver on

July 21, 2000 that Joyner had instructed them to perform the

inspections.   From this, Joyner infers the possibility that the home

had actually undergone an honest and appropriate inspection.   Yet,

nowhere in his deposition does Bowles indicate that he inspected the

house.   To the contrary, his reaction, when called to look at the

house after the closing and following the complaints of the

plaintiffs, suggested his surprise, if not alarm, at the deficiencies

in the house and at the likelihood that many inspections had not

actually been performed.    (Dep.  of  Bowles  [206]  at  8-10.)

Similarly, nowhere in his deposition does Scott Burch indicate any

memory of having inspected the house, although he indicated it was

possible that he had forgotten. (Dep. of Scott Burch [207] at 6-7.)

In summary, based on Oliver's Affidavit, one can reasonably

conclude that the necessary inspections did not occur and that this

was so because defendant Jim Joyner used his power as Chairman of the

County Commission to cause this to happen. As to the problems that

plaintiffs have had with their septic tank, taking the facts in the

12

light most favorable to plaintiff, they have adduced sufficient evidence, through their own expert's declaration, to indicate that the soil on their property was not of the appropriate type to permit a standard sewer system to be operational. Moreover, it is undisputed that defendant Joyner would have been required to pay for a more expensive system, had the health department not issued a permit allowing a standard system to be installed. Thus, Joyner had a financial interest in a soil report that would indicate the appropriateness of a standard system. It is also undisputed that initially the soil expert firm had classified the soil in a manner that would not have permitted a standard sewer system to be installed. This firm was a sub-contractor of Joyner's and the owner of the firm was later called back to the property to reinspect it, which he did, in the presence of Joyner and the Health Department official. On this occasion, the expert reclassified the soil, which enabled the Health Department official to give the go-ahead for installation of a standard sewer system.

These facts do not directly indicate, as does the evidence concerning the building inspections, any manipulation by Joyner of the soil inspection.[2] Were the Court faced with the septic tank

_____

[2] Mr. Kendall, the soil inspector who performed the second inspection, testified that Joyner did not influence his decision to reclassify the soil, and that he made his decisions according to his professional opinion. (Kendall Dep. [211] at 40-41.) A jury could

13

permit allegation, by itself, it is not clear that plaintiffs would

have set out sufficient facts to warrant an inference of intentional

manipulation by Commissioner Joyner, as opposed to citizen Joyner, of

inspection results.   As plaintiffs have adduced sufficient evidence

with regard to the building permits, the facts surrounding the soil

inspection, however, constitute further circumstantial evidence, as

well as *res gestae* evidence, that plaintiff could introduce at a

trial.

---

perhaps disagree with this testimony as an expert employed by
plaintiff has questioned Kendall's conclusion and, plaintiffs have
suffered enormous problems with drainage and groundwater issues.
Moreover, Kendall was being paid by Joyner, thereby giving him a
motive to please the latter with his recommendation.   Yet, any
influence, tacit or otherwise, by Joyner on Kendall would presumably
not be traced to Joyner's position as a county commissioner, so much
as his position as a person who could offer Kendall future business.
Thus, any influence on Kendall, for which there is no direct
evidence, would not appear to implicate § 1983.

It is true that Ms. Glinda Scott, the Environmental Health
County Manager for the Henry County Environmental Health Department,
ultimately made the decision to issue the permit authorizing the
standard septic tank.   (Scott Dep. [189] at 23-24.)   She testified
that she made her decision on this matter, based on the report by the
soil expert, Mr. Kendall.   Certainly, it is possible that Ms. Scott
was influenced by defendant Joyner's position in deciding to go with
this second report, as opposed to the first report issued by
Kendall's company.   If so, defendant's conduct in so manipulating the
septic tank permit could trigger § 1983 scrutiny, as the action of a
state actor.   Yet, one would have to speculate to reach the above
conclusion, and Ms. Scott's testimony is certainly to the contrary.

AO 72A
(Rev.8/82)

## B.   Violation of the Equal Protection Clause

Plaintiffs have alleged that Joyner's conduct violated the equal protection clause. Plaintiffs are obviously not alleging a typical equal protection violation, which sets out discrimination based on one's race, ethnicity, or group identification. Instead, plaintiffs are arguing, in effect, that, as purchasers of property developed by Commissioner Joyner, they were treated differently than purchasers of property not developed by him. Henry County presumably performed some building inspections in a legitimate manner. Indeed, Oliver affied that the inspection process performed on plaintiffs' house was irregular. Plaintiffs therefore contend that because they bought property developed by the defendant, the highest ranking official in Henry County, they were not accorded the usual protections afforded other home buyers in the county.

The Court assumes that plaintiffs can make out an equal protection claim on the "class of one" theory articulated by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). In *Olech,* the village official required the plaintiff to give them a 33-foot easement before they would allow her access to the municipal water supply, but only required a 15-foot easement for other residents. *Id.* at 563. The Supreme Court held that its cases "have recognized successful equal protection claims brought by a 'class of one' where the plaintiff alleges that she has been

15

intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564, citing *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). The Court noted that it is the purpose of the Equal Protection Clause "'to secure every person...against intentional and arbitrary discrimination, whether occasioned by express terms of a statue or by its improper execution through duly constituted agents. *Id.* (citations omitted.)

Here, defendant Joyner contends that he could not have discriminated intentionally against the plaintiffs because he had never met them and had no idea who would be buying the property when the inspection property was under way. Yet, the Court does not construe "intentional discrimination" as requiring that one know the identity of the victims of one's acts. Here, if the facts are as plaintiffs alleged, Joyner necessarily knew that someone would be buying the house at Lot 67 and he acted, intentionally, in a manner that would cause those purchasers to be treated differently than other purchasers whose inspection process had not been manipulated by Joyner.

The Court therefore concludes that plaintiffs have made out an equal protection claim under the "class of one" theory.

AO 72A
(Rev.8/82)

C.    **Qualified Immunity**

As a public official, however, defendant Joyner is potentially eligible for immunity for actions taken by him as a public official. "The importance of vindicating constitutional rights in a court of law must be balanced against the social costs associated with burdening public officials with vexatious litigation and inhibiting them in the proper discharge of their official duties." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007)(citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).    To establish entitlement to qualified immunity, the official must first show that he was acting within the scope of his discretionary authority. *Id.* at 1199.    If the defendant has done this, the burden then shifts to plaintiffs to overcome the defendant's qualified immunity defense by demonstrating that the defendant's actions violated clearly established legal authority. *Id.*

The Court is not yet convinced that any actions taken by defendant Joyner were within his discretionary authority.    If not, he cannot take advantage of the qualified immunity doctrine.    Second, the Court is uncertain whether clearly established law existed in 2000 to forewarn the defendant that his actions would violate the equal protection clause.    Neither party has briefed either question thoroughly enough for the Court to make a determination. Accordingly, the Court will deny without prejudice defendant Joyner's

17

motion for summary judgment on qualified immunity grounds to allow rebriefing by the defendant.

As to the first question--whether defendant Joyner was acting within his discretionary authority as County Commission Chairman when he took the acts attributed to him by plaintiffs--defendant has not yet persuaded the Court that he was. Typically, qualified immunity defenses attach to acts that are clearly within a governmental actor's discretionary authority. For example, when a police officer is charged with using excessive force to effect an arrest, there is rarely any question that the officer has arrest power. Instead, that prong of the qualified immunity defense is almost always a given; it is the second prong--whether the law clearly forbade the officer from using the amount of force inflicted--that is the pivotal question.

Here, plaintiffs are accusing the defendant of using his power as a commissioner to cause a certificate of occupancy to be issued for a home when many of the inspections required by county law had not been performed.[3] Likely, it would be within a commissioner's discretionary authority to intervene and request an inspection, where a constituent complains that inspectors are dragging their feet. The

_____

[3] According to plaintiffs, Joyner's position as Chairman of the Henry County Board of Commissioners does not include the "duty to instruct the Building Department to pass houses without inspection or to classify soil for issuance of a septic permit." (Pls.' Resp. to Joyner's Mot. for Summ. J. [201] at 21.)

AO 72A
(Rev.8/82)

Court, however, doubts that the conduct that plaintiffs accuse defendant of committing--directing to inspectors, not just to inspect, but to falsify a result or report--would ever be conduct that is within the job description of a county commissioner. Moreover, here there was no constituent prodding the defendant. Plaintiffs argue that Joyner was acting out of his own self-interest as a developer and business associate of the builder who shoddily constructed their home.

Ultimately, defendant may persuade the Court that this conduct was within his discretionary authority. To do so, defendant must lead the Court through case authority that would persuade the Court as to this contention. Assuming that the defendant does persuade the Court that he was acting within his discretionary authority, defendant is entitled to qualified immunity unless: (1) the defendant violated a constitutional right and (2) the right was clearly established. *Griffin*, 496 F.3d at 1199. If the defendant did not violate a constitutional right, the inquiry ends. *Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007). As noted, however, the Court has found that, taken in the light most favorable to the plaintiff, the evidence suggests a violation of a constitutional right.

The next question for rebriefing[4] then is whether the defendant's

---

[4]    Defendants may also rebrief the question whether a constitutional right was violated if it has persuasive case authority

19

conduct contravened clearly established law. On this point, the plaintiffs may have the more uphill struggle. One could reasonably argue that the Supreme Court's decision in *Olech*, which was decided before the date that Joyner allegedly ordered the certificate of occupancy to be issued without the proper inspections, should have put defendant on notice that his conduct could implicate the "class of one" theory of equal protection law. The village officials in *Olech* intentionally treated the Olechs differently than other citizens seeking water service. Here, defendant allegedly treated plaintiffs differently than homebuyers who were not purchasing a home on property that defendant had developed and in which he had a financial interest.

Yet, in *Griffin Ind., Inc. v. Irvin*, 496 F.3d 1189, 1208-9 (11th Cir. 2007), the Eleventh Circuit rejected, in *dictum*, an argument that *Olech* had provided notice to the defendant in that case of the illegality of its conduct. The Eleventh Circuit noted that a much higher standard of similarity between *Olech* and subsequent cases must exist. The language in *Griffin Industries,* therefore, suggests that plaintiffs may not be able to rely on *Olech*.

If so, the operative Eleventh Circuit case authority on interpretation of the Equal Protection Clause here may be *E&T Realty*

to offer.

20

*v. Strickland*, 830 F.2d 1107 (11th Cir. 1987), which is discussed a bit by both parties. *E&T* does not mention the "class of one" theory, but it does address a situation in which a county was accused of violating the equal protection clause by applying a facially neutral statute unequally between different commercial entities. Specifically, the plaintiff accused the defendants of treating the plaintiff differently than other property owners with regard to sewer allocations. In its holding, the Eleventh Circuit held that mere error or mistake in judgment when applying a facially neutral statue does not violate the equal protection clause. Rather, the governmental decision-maker must intentionally discriminate. 830 F.3d at 1114. Further, the "intentional" part of the requirement means more than that the defendants were aware of the consequences of their actions. Instead, these actors must have selected "a particular course of action at least in part 'because of'...its adverse effects upon an identifiable group." *Id.* (citation omitted.) In conclusion, the Eleventh Circuit held that, for a plaintiff to prevail on this kind of theory, "defendants' conduct must have been deliberately based on an unjustifiable, group-based standard." *Id.*

Defendant may argue that he did not take the alleged course of action <u>because</u> of its impact on any group. While it was predictable that homebuyers who bought a house that had not been adequately inspected might be buying defective construction, it was not the

21

defendant's primary goal to harm these people. Instead, even accepting plaintiffs' allegations, defendant's primary goal was to enrich himself or his business colleague by preventing an inspection that would cause the latter to undergo further expensive repairs. On the other hand, plaintiffs may argue that "an unjustifiable, group-based standard" was used here: homes that the defendant had an interest in as a developer (and therefore homebuyers of those homes) were treated differently. The parties should make these arguments, in the first instance, however.

Accordingly, if he wishes to renew his motion for summary judgment on the § 1983 claim, defendant Joyner, **within 30 days**, should file a memorandum in support of his renewed motion. As set out above, this memorandum should address the following issues: (1) whether defendant Joyner was acting within his discretionary authority; and (2) whether the law clearly established that Joyner's alleged conduct violated the Equal Protection clause. Defendant may also address the question whether defendant's conduct violated that clause, although the Court doubts it will change its mind on this point. Defendant Joyner may refer back to previous pleadings. The Court is aware that it is plaintiffs' burden to show that the law was clearly established, but to insure an orderly briefing process, defendant should address that issue initially, as well.

Plaintiffs may respond, if they choose. From reading the

22

depositions, the Court is aware that the plaintiffs have suffered substantial financial and legal expenses as a result of their efforts to obtain relief on their poorly-constructed house. Plaintiff Charles Reuss's deposition indicated that plaintiffs were paying their attorneys by the hour. Plaintiffs' counsel have now withdrawn and, accordingly, plaintiffs are proceeding *pro se.*

To avoid causing plaintiffs to incur further expenses, the Court will not require them to file a response to defendant's renewed motion. Plaintiffs may rely on their counsel's previous brief and the Court will examine all pertinent cases to make an independent judgment.

III.     **DEFENDANT HENRY COUNTY'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' § 1983 EQUAL PROTECTION CLAIM**

Relying on the same evidence set out in the preceding discussion of plaintiffs' § 1983 claim against defendant Jim Joyner, plaintiffs have also filed a § 1983 claim against Henry County. As with the Joyner claim, plaintiffs contend that their equal protection rights were violated when they, as home buyers of property developed by Commissioner Joyner, were treated differently and less favorably than other home buyers because the plaintiffs did not receive the same inspections of their property, as did other home buyers. They claim that defendant Henry County, along with defendant Joyner, is liable for this disparate treatment. The Court disagrees.

23

While an individual state employee or official may be held responsible under § 1983 for a constitutional violation where the law was clearly established that the conduct, in fact, violated the Constitution, this is not the standard applied to the municipality that employs the state actor. A municipality, such as Henry County, cannot be held liable for the actions of one of its officials or employees on a *respondeat superior* theory. *Quinn v. Monroe County,* 330 F.3d 1320, 1325 (11th Cir. 2003), citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). Rather, the county can be found liable only for the execution of a governmental policy or custom by one who possesses final authority to establish municipal policy with regard to the action ordered. *Id.*

As Chairman of the County Commission, Jim Joyner likely had many powers and duties. Plaintiffs, however, have not shown that he had any power to require or ask a subordinate to violate county or state law, by falsely representing that a building inspection had occurred. Moreover, as defendant Henry County notes, Georgia law dictates that official policy for a county is established by its Board of Commissioners. (Def. Henry County's Mot. for Summ. J. [179-2] at 7.) *See Cooper v. Dillon,* 403 F.3d 1208, 1221 (11th Cir. 2005) (state and local positive law determine whether a particular official has final policymaker authority for § 1983 purposes)(citation omitted). Thus, the action of a rogue commissioner, if unendorsed by his fellow

24

commissioners, does not constitute the policy of the county. *Campbell v. Rainbow City, Ala.,* 434 F.3d 1306, 1313 (the improper motive of one member of a nine-member commission is not imputed to the rest of the commission for § 1983 purposes); *Mason v. Village of El Portal,* 240 F.3d 1337, 1339 (a discriminatory motive of only one member of a three-member majority of a five-member council cannot give rise to municipal liability).

Here, at most, one member of the Henry County Commission caused an improper action to have been taken by subordinates. That action, taken by a rogue member and without the knowledge of the Commission, itself, cannot impose § 1983 liability on the County. Accordingly, the Court **GRANTS** defendant Henry County's motion for summary judgment on plaintiffs' § 1983 claim against it.

## IV. <u>STATE LAW CLAIMS</u>

Defendants Jim Joyner and Henry County have moved for summary judgment on all state law claims alleged against them by plaintiffs. Likewise, defendant Joyner Brothers has also moved for summary judgment on the state law claims made against it. The Court declines to address these motions at this time. If, following supplemental briefing by defendant Jim Joyner, the Court concludes that plaintiffs' federal claim against him should proceed to trial, it will then reactivate and revisit the motions by all defendants for summary judgment on state law claims. If the Court ultimately

25

AO 72A
(Rev.8/82)

concludes that summary judgment should be granted to defendant Joyner on the § 1983 federal claim against him, no federal claims will remain in this case and the Court will then decline to exercise supplemental jurisdiction over the state law claims, allowing them to be litigated in the appropriate state court. Thus, to conserve judicial resources, the Court **DENIES WITHOUT PREJUDICE** the motions for summary judgment on state law claims made by defendants Jim Joyner, Henry County, and Joyner Brothers.

## V.  CONCLUSION

The Court **DENIES WITHOUT PREJUDICE** defendant Joyner Brothers Motion for Summary Judgment [176]; **GRANTS** defendant Henry County's Motion for Summary Judgment on federal claim [179] and **DENIES WITHOUT PREJUDICE** its Motion for Summary Judgment on state law claims [179]; and **DENIES WITHOUT PREJUDICE** defendant Jim Joyner's Motion for Summary Judgment [183].

As set out above, if defendant Jim Joyner wishes to continue to pursue his motion for summary judgment on the federal claim, he shall file a supplemental memorandum on this motion **within thirty days**. The Court will deem this supplemental memorandum as a renewal of defendant's motion for summary judgment. The Court **GRANTS** plaintiffs' Motion for Extension of Time [194].

26

SO ORDERED, this _30_ day of September, 2008.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

27